UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

DONALD EERDMANS,                                    Case No. DG 09-01146
                                                    Chapter 7
            Debtor.                                 Hon. Scott W. Dales
_____/

UNITED STATES TRUSTEE,                              Adv. Pro. No. 09-80457

            Plaintiff,

v.

DONALD EERDMANS,

            Defendant.
_____/

OPINION AND ORDER

PRESENT:   HONORABLE SCOTT W. DALES
           United States Bankruptcy Judge

I.   INTRODUCTION

This matter comes before the court on the United States Trustee's Complaint to Deny Discharge of Donald Eerdmans (the "Debtor") pursuant to 11 U.S.C. § 727(a)(4)(A). In his complaint the United States Trustee ("UST") alleges that the Debtor made a false statement on his bankruptcy petition and falsely testified at his first meeting of creditors. The court held a trial on February 4, 2011 in Grand Rapids, Michigan.  For the following reasons, the court will enter judgment in favor of granting the Debtor's discharge.

## II.    JURISDICTION

The court has subject matter jurisdiction over the Debtor's bankruptcy case pursuant to 28 U.S.C. § 1334(a), and this adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).  Pursuant to 28 U.S.C. § 157(a) and LCivR 83.2(a) (W.D. Mich.), the court may enter final judgment, subject to appellate review under 28 U.S.C. § 158.

## III.    APPLICABLE LAW AND THEORY OF THE CASE

The UST relies on a "false oath" theory in seeking to deny the Debtor a Chapter 7 discharge.  Initially, the UST contended that when the Debtor filed a petition naming Pamela Eerdmans ("Ms. Eerdmans") as a joint debtor and then verified that petition as accurate under penalty of perjury, he uttered a "false oath" within the meaning of the statute. During closing argument, the UST conceded that the evidence did not support that aspect of his case, and that the Debtor was mistaken about whether Ms. Eerdmans was properly listed as a joint debtor.

The UST also contended that the Debtor made a false oath at his first meeting of creditors when he testified that his attorney prepared the petition naming Ms. Eerdmans as a debtor, and faxed or emailed it to the Debtor for his signature. According to the UST, the Debtor himself drafted the document and lied under oath about the precise role his attorney played in the drafting.

The Debtor did not challenge the fact that he made the alleged misstatements or their materiality, but instead argued that he was confused or mistaken about precisely who drafted the petition he signed and filed on February 6, 2009. In other words, he denies fraudulent intent.

The applicable statute provides, in relevant part, that the court shall withhold a Chapter 7 discharge from a debtor who "knowingly and fraudulently, in or in connection with the case . . .

made a false oath or account . . ." 11 U.S.C. § 727(a)(4)(A).  The Sixth Circuit summarized a

plaintiff's burden under a false oath theory as follows:

> In order to deny a debtor discharge under this section, a plaintiff must prove
> by a preponderance of the evidence that: 1) the debtor made a statement
> under oath; 2) the statement was false; 3) the debtor knew the statement was
> false; 4) the debtor made the statement with fraudulent intent; and 5) the
> statement related materially to the bankruptcy case.

*Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir. 2000) (citations omitted).  Given the

difficulty of proving fraudulent intent, the court can draw inferences based upon all the facts and

circumstances, a debtor's pattern of conduct, and his reckless indifference to the truth -- all of

which may suggest fraud. *Sicherman v. Rivera (In re Rivera)*, 356 B.R. 786 (6th Cir. BAP 2007).

In considering exceptions to discharge, the court must construe the statute in the Debtor's

favor. *In re Keeney*, 227 F.3d at 683 (citing *Barclays/American Bus. Credit, Inc. v. Adams (In re*

*Adams)*, 31 F.3d 389, 394 (6th Cir.1994), *cert. denied*, 513 U.S. 1111 (1995)).


## IV.   FINDINGS OF FACT

At trial, Donald Eerdmans, Pamela Eerdmans, and Brett N. Rodgers testified in person.

The court also admitted the transcribed testimony of the Debtor's former attorney, Francois

Nabwangu, pursuant to Fed. R. Civ. P. 32(a)(4) & (c).  In addition to this testimony, the court

admitted thirteen documents into evidence, mostly without objection, including the transcript of

the Debtor's testimony at the first meeting of creditors, upon which the UST's case principally

depends.  Having considered all the evidence, the court makes the following findings of fact and

conclusions of law pursuant to Fed. R. Civ. P. 52 and Fed. R. Bankr. P. 7052.

On February 6, 2009, the Debtor filed a barebones, voluntary Chapter 13 bankruptcy

petition. The caption of the petition named both Donald Eerdmans and his estranged wife,

**Page 3 of 13**

Pamela Eerdmans ("Ms. Eerdmans") as joint debtors, but only Donald Eerdmans signed the petition. Although the petition lacked any signature from Ms. Eerdmans, the court's Clerk accepted the petition for filing. *Compare* Fed. R. Bankr. P. 5005(a) *with* Fed. R. Bankr. P. 9011(a).

Trial testimony established that the Debtor and Ms. Eerdmans were parties to a hotly-contested divorce proceeding pending for several years before the Hon. Kathleen Feeney of the Kent County Circuit Court.  In October, 2008, Judge Feeney gave a bench ruling in which she announced her intention to divide marital property in a manner that did not please the Debtor. More specifically, the Debtor believed that the spouses' jointly-held 11.78 acre parcel commonly known as 5952 68th Street, Caledonia, Michigan (the "11.78 Acres") was worth $450,000.00, though Judge Feeney had assigned a value of only $114,000.00.  In the Debtor's view, by dramatically undervaluing the 11.78 Acres, assigning that property to Ms. Eerdmans, and assigning less valuable property to the Debtor as supposedly equivalent, Judge Feeney was deliberately punishing him for having an extramarital affair and other perceived misdeeds in connection with his failed marriage. At the conclusion of her oral ruling in October, 2008, Judge Feeney directed the parties to submit a form of judgment for her review which, upon signature, would become the divorce court's judgment dissolving the marriage and dividing the marital property.

During the divorce proceedings, and before Judge Feeney could enter judgment, the Debtor's plastics manufacturing business began to suffer as the economy (and especially the construction sector) declined, and his child support and other debts began to mount.  He felt the need to seek relief under the Bankruptcy Code to deal with his debts and put the brakes on what he perceived to be Judge Feeney's inequitable valuation and allocation of the 11.78 Acres.

He sought advice about his divorce, business, and other legal problems from Francois Nabwangu ("Mr. Nabwangu"), an attorney from Ann Arbor who advertised on the internet.[1]  Mr. Nabwangu met with the Debtor at the Debtor's Grandville home sometime in late 2008 or early 2009, and discussed Judge Feeney's imminent judgment, the Debtor's declining manufacturing business, and his child support arrearages.  The two men agreed that the Debtor should probably file a bankruptcy petition to deal with his manifest troubles.

After the in-home consultation, the Debtor tendered to Mr. Nabwangu a check in the amount of $1,000.00 as a retainer, but later had a change of heart and stopped payment, causing the check to bounce.  This did not favorably dispose Mr. Nabwangu to the Debtor's cause, yet it did not prevent him from taking several phone calls, and spending several hours on the telephone with the Debtor on the weekend before the Debtor's next scheduled court appearance before Judge Feeney.  Mr. Nabwangu and the Debtor felt that he needed to act quickly to file a voluntary petition in order to stay the divorce court's February 6, 2009 hearing at which, the Debtor feared, Judge Feeney would finalize her adverse decision regarding the 11.78 Acres.

On the Sunday evening before the Monday morning hearing, the Debtor telephoned Mr. Nabwangu for help in filing a bankruptcy petition.  According to Mr. Nabwangu's deposition testimony, he was at his office working after-hours on an unrelated appeal when he received the Debtor's telephone call. Although still smarting from the bounced retainer check, Mr. Nabwangu nevertheless felt moved enough by the Debtor's circumstances to help him avoid the imminent decision from the divorce court.

The Debtor and Mr. Nabwangu both testified that the late-night petition-preparation took place over the telephone, with faxes and email transmissions being exchanged back and forth.

---

[1] At the time of trial, Mr. Nabwangu had moved to New York City, beyond the court's subpoena power.

Given the lateness of the hour -- Mr. Nabwangu was in his pajamas when the call came in -- their testimony is understandably indefinite.

They both testified that they discussed whether to include Ms. Eerdmans as a joint debtor, given that she was obligated on "joint debts."   Indeed, at trial, the Debtor testified that he believed that naming his soon-to-be ex-wife as a debtor in the caption of the petition made sense because they jointly owed marital debts and she was about to lose the former marital home to foreclosure.  Mr. Nabwangu admitted that the Debtor asked him whether he should include Ms. Eerdmans as a joint debtor on his petition, and with the benefit of hindsight, he also admitted that the answer  should have been "self-evident" -- not to include her as a debtor unless she agreed and signed the petition.[2]  Nevertheless, his late-night advice was simply that the Debtor should ask the court's Clerk how to proceed with respect to Ms. Eerdmans, given the joint nature of some of their debts.

Unfortunately, the Debtor took Mr. Nabwangu's advice, which disregarded the fact (obvious to almost any lawyer) that the Clerk does not give legal advice, and ignored the rule that the Clerk "shall not refuse to accept for filing any petition . . . solely because it is not presented in proper form as required by these rules or any local rules or practices."  Fed. R. Bankr. P. 5005(a)(1).  Under the circumstances, the Clerk accepted the joint-petition for the Debtor and for Ms. Eerdmans even though it was not in the proper form, *id.*, but regrettably the Clerk did not promptly strike the petition for lacking her signature. *See* Fed. R. Bankr. P. 9011(a) ("An unsigned paper shall be stricken unless the omission of the signature is corrected promptly after being called to the attention of the attorney or party"). Throughout the process, the Debtor

---

[2] According to her credible testimony, Ms. Eerdmans was utterly unaware that her estranged husband included her on the petition until some of her creditors refused to accept payment on her accounts because she had filed a bankruptcy petition. By order dated May 7, 2009, the court dismissed the petition as it purported to pertain to Ms. Eerdmans.

wondered whether his estranged wife's signature was necessary, and made inquiries of Mr. Nabwangu after he filed his petition.  *See* Exhibit C, pp. 11-13.

Later, when the Debtor filed his schedules, the Clerk accepted them and promptly struck them because they did not include Ms. Eerdmans's name in the caption.  He included his wife as a co-debtor on Schedule H, *see* Exhibit 2, pp. 18-19, and testified at trial that he thought the terms "co-debtor" and "joint debtor" were synonymous.  The court finds that the Debtor was confused about the propriety of listing his wife as a "debtor" on the petition.

Chapter 13 Trustee Brett N. Rodgers conducted the first meeting of creditors pursuant to 11 U.S.C. § 341 on March 16, 2009. The Debtor appeared at the meeting without counsel and testified that he had not discussed the bankruptcy filing with Ms. Eerdmans; that he did not have her authority to sign or file a petition on her behalf; and that in fact, he and Ms. Eerdmans were going through a divorce. He further explained that on the morning he filed the bankruptcy petition, there was a hearing scheduled in the divorce case during which, he believed, Judge Feeney would finalize the adverse property division by bestowing the 11.78 Acres on Ms. Eerdmans as part of her share of the marital estate.

The UST, through trial counsel, also attended the first meeting of creditors, and asked the Debtor questions, under oath, regarding the circumstances surrounding the filing of the petition, especially as it pertained to Ms. Eerdmans. Quite properly, the UST was concerned about the Debtor's improperly naming Ms. Eerdmans on the petition without her permission and its effect on her credit.

Evidently not satisfied with the Debtor's responses to questioning and the Debtor's inability to produce documentary evidence supporting his version of events, the UST filed a complaint to deny the Debtor a discharge under 11 U.S.C. § 727(a)(4).

The UST originally contended that the Debtor falsely verified the petition as being filed on Ms. Eerdmans's behalf, and falsely stated under oath at the first meeting of creditors that Mr. Nabwangu prepared the petition that named Ms. Eerdmans as a debtor. At trial, however, the testimony established that the Debtor -- a layman untutored in bankruptcy law and relying on unwise and incomplete advice from Mr. Nabwangu -- mistakenly believed that he was required to list her as a joint debtor because he and Ms. Eerdmans had joint debts.

The court has reviewed the petition and it appears that Ms. Eerdmans's name appears only in the caption and nowhere else on that document.  It also appears that Ms. Eerdmans did not sign the petition, nor did the Debtor forge or otherwise affix her signature to the petition. From the review of the petition itself, the Debtor's trial testimony, and the testimony of Mr. Nabwangu, the court concludes that Mr. Eerdmans did not make a false oath when he verified the petition naming Ms. Eerdmans as a debtor.  Though inaccurate, the verification was not knowing and fraudulent. Rather, including Ms. Eerdmans as a joint debtor on his petition was the product of ignorance and inattention on the part of the Debtor and his supposed counsel, Mr. Nabwangu.

The only remaining false oath that the UST raises in support of his complaint involves the Debtor's testimony during the first meeting of creditors.  Although a closer question, the court cannot find by a preponderance of the evidence that the Debtor misrepresented Mr. Nabwangu's role in drafting the petition.

At the first meeting of creditors on March 16, 2009, the Debtor said at least three separate times that Mr. Nabwangu was the person who drafted the bankruptcy petition and transmitted it to him for signature.  As the Debtor conceded at trial, he was unable to produce any documentary evidence supporting these statements, and, in fact, he came to doubt their veracity himself.

Indeed, in contrast to his prior testimony, he stated at trial that he could not swear one way or another whether Mr. Nabwangu actually drafted the petition. The UST properly became concerned when the Debtor was unable to produce any documentary evidence of the facsimile transmission or e-mail transmission from Mr. Nabwangu to the Debtor on or about February 5, 2009, and urged the court to infer, from this lack of evidence and from the Debtor's equivocal trial testimony, that he perjured himself during the first meeting of creditors.

The record, however, does include substantial evidence to support the Debtor's version of events. As noted above, both he and Mr. Nabwangu testified that they exchanged numerous documents on the evening of February 5, 2009. *See* Exhibit I at pp. 8-11. Specifically, when the UST's counsel asked him whether he actually drafted the three-page bankruptcy petition for the Debtor, Mr. Nabwangu responded:

> I would have certainly helped him draft it. I can't remember whether it was him filling it in or myself, but we were going back and forth. We had fax machines, we had e-mail and we had the phone and we were trying to get the petition done. So I certainly assisted him in filling it – in drafting it.

*See* Exhibit I, p. 10, lines 17-21. Moreover, the record includes an invoice e-mailed from Mr. Nabwangu to the Debtor, with the following brief description of services: "Prep Bankruptcy Petition 4.0 $240.00." *See* Exhibit C, p. 9.

Although the UST did not include Mr. Nabwangu's testimony as part of his case-in-chief (on the grounds that the testimony was primarily relevant to the Debtor's "advice of counsel" defense), the UST made much of the fact that Mr. Nabwangu denied actually drafting the petition at several points in his testimony.

As the parties agreed at trial, Mr. Nabwangu was "unavailable" within the meaning of Fed. R. Civ. P. 32, so the court was relegated to the transcript of Mr. Nabwangu's testimony,

without the ability to judge his demeanor and, more generally, credibility. The UST's reliance on Mr. Nabwangu's testimony in closing argument as evidence that the Debtor lied during the first meeting of creditors, however, depends upon the court's crediting Mr. Nabwangu's transcribed testimony and discrediting the Debtor's live testimony. With respect to Mr. Nabwangu's testimony, the court notes that some of it was hedged by using phrases such as "I'm pretty sure," and "I think,"[3] though elsewhere he was more definite.[4] Moreover, as to possible bias, the court observes that Mr. Nabwangu's substandard and ill-considered role in serving as the Debtor's shadow counsel, his ignorance of the rules and, to some extent, flouting of them,[5] certainly gave him every incentive to minimize his role in this case when confronted by the UST at deposition. The court assumes that Mr. Nabwangu is aware of Fed. R. Bankr. P. 9011 and his possible licensing and civil exposure for his role in preparing the Debtor's case. He conceded that he was not admitted to practice in the Western District of Michigan, but nevertheless gave half-hearted assistance in the nature of legal advice in connection with the proceeding. Perhaps borne of good intentions, perhaps designed to recoup the bounced retainer, Mr. Nabwangu dabbled in the Debtor's bankruptcy preparation, and harmed a number of people in the process. So, although the court acknowledges that Mr. Nabwangu denied actually drafting the petition, the court gives this testimony very little weight under the circumstances suggesting bias and precluding a full evaluation of credibility.

As for the Debtor's trial testimony, the court finds it more credible given the fast pace and slipshod petition preparation on the eve of the petition date, the flurried exchange of papers that Sunday evening, and the passage of time between that date and trial. It is certainly possible to conclude, as the UST has, that the Debtor deliberately distanced himself from his testimony at

---

[3] *See* Exhibit I at p. 10, line 24; p.11, lines 19-21.
[4] *See* Exhibit I at p. 34, line 15 through p. 35, line 6; *id.* at p. 36, line 16.
[5] Mr. Nabwangu failed to file any statement under Fed. R. Bankr. P. 2016.

the first meeting of creditors to avoid perjuring himself again. The court, however, reaches a different conclusion, finding the earlier testimony premised more on confusion and perhaps a self-serving and defensive, though not fraudulent, recollection of events.

The court, therefore, finds as follows. The debtor clearly made a statement under oath that related materially to his bankruptcy case, concerning Mr. Nabwangu's role in drafting the petition which named Ms. Eerdmans as a joint debtor. Given that the Debtor unquestionably signed the petition, the precise identity of the drafter may not seem material to the estate, or to the existence or location of assets and similar information typically associated with a false oath proceeding. Nevertheless, the court regards the statements as material because the Debtor made them under oath at the first meeting of creditors and they affected the UST's performance of important responsibilities as "watchdog over the bankruptcy process." *See* House Report No. 989, 95th Cong., 2d Sess. at 88 (*reprinted in* 1978 U.S. Code Congressional & Admin. News at 5787, 5963, 6049); *see also* 28 U.S.C. § 586(a) *and* 11 U.S.C. § 329.

The UST, however, has not established by a preponderance of the evidence that the statement was false, or that the Debtor knew it was false, or made the statement with fraudulent intent. *See In re Keeney*, 227 F.3d at 685. Accordingly, the court will enter judgment dismissing this adversary proceeding, and directing the Clerk to enter the Debtor's discharge forthwith in accordance with Fed. R. Bankr. P. 4004(c).

## V.    CONCLUSION AND ORDER

The court is satisfied that the Debtor is entitled to a discharge, and therefore will take steps to give him that important benefit of his filing. The court is not satisfied, however, that others involved in this case have lived up to their responsibilities.

First, the court is profoundly concerned about Mr. Nabwangu's role in advising the Debtor in connection with a case to be filed in the Western District of Michigan, though he did not seek admission to practice, enter an appearance, disclose compensation and other arrangements, and otherwise comply with the potentially applicable provisions of the United States Bankruptcy Code. *See, e.g.*, 11 U.S.C. §§ 110, 329, 526-28; *see also* Fed. R. Bankr. 2016 and 9011(b). In addition, advising a client to seek legal advice from court personnel may fall outside the range of competent legal advice, particularly given the Clerk's obligation to accept all papers for filing regardless of form. *See* Fed. R. Bankr. P. 5005.

Under applicable law, the court is required to take appropriate action "upon learning of reliable evidence indicating the likelihood that a lawyer violated applicable rules of professional conduct." *See* Canon 3(B)(5), Code of Conduct for United States Judges. Accordingly, pursuant to 11 U.S.C. § 329, the court will enter an order to show cause why Mr. Nabwangu should not disgorge the $1,000.00 in fees he collected from the Debtor post-petition. *See* Exhibit C at p. 10.

For its part, the court's role in this matter merits introspection. The court finds no fault with the Clerk in accepting the petition, as Fed. R. Bankr. P. 5005 seems to require. And, given that the UST filed a motion to dismiss the petition promptly after the petition date, the court understands why the Clerk's office may have refrained from striking the partially unsigned petition under Fed. R. Bankr. P. 9011(a) and LBR 5005-2. Nevertheless, the court will review with the Clerk and other judges the procedures for responding to defective petitions and other papers to ensure that the court does all it can to prevent abuse or injury resulting from its internal procedures, the public's right of access to court records, and the foreseeable electronic dissemination of information to the public, including credit and other reporting agencies.

NOW, THEREFORE, IT IS HEREBY ORDERED that the Clerk shall:

(1) enter judgment dismissing the UST's Complaint with prejudice, and without costs; and

(2) enter the Debtor's discharge forthwith, using the court's usual form.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Opinion and Order upon Michael V. Maggio, Esq., John A. Potter, Esq., and Donald Eerdmans pursuant to Fed. R. Bankr. P. 9021 and LBR 5005-4, and upon Francois Nabwangu, Esq., by first class mail addressed to him at Golding PC, 299 Broadway, Suite 710, New York, NY 10007.

END OF ORDER

**IT IS SO ORDERED.**          Scott W. Dales
United States Bankruptcy Judge     **Dated: February 15, 2011**